## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

ANTHONY DELLO RUSSO,
  *Plaintiff,*

v.

SECURITAS SECURITY SERVICES
USA, INC.,
  *Defendant.*

C.A. No. 1:22-cv-11194

**PLAINTIFF DEMANDS TRIAL BY JURY**

## COMPLAINT

This action is commenced by ANTHONY DELLO RUSSO (hereinafter "Plaintiff") against SECURITAS SECURITY SERVICES USA, INC. (hereinafter "Defendant") to remedy and seek relief for unlawful employment practices arising under *The Age Discrimination in Employment Act of 1967*, 29 U.S.C. § 623(a) and § 623(d) ("ADEA"), The Americans with Disabilities Act 42 U.S.C. §§ 12112, 12203 ("ADA"), The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., as amended by the Families First Coronavirus Response Act, Public Law 116-127 (FFCRA), The Fair Labor Standards Act (FLSA) 29 U.S.C. § 215(a)(3), The Massachusetts Wage Act ("Wage Act"), and the Massachusetts Fair Employment Practices Act ("151B"), M.G.L. c. 151B.

## PARTIES

1.  Plaintiff resides in Methuen, County of Essex, within the Commonwealth of Massachusetts and formerly worked for Defendant at the Pfizer Pharmaceuticals Andover, Massachusetts location.

2.  Defendant is a foreign, for-profit corporation doing business in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

4.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

5.  This Court has personal jurisdiction over Defendant because Defendant has the requisite minimum contacts with the Commonwealth of Massachusetts and availed itself of the rights and privileges in Commonwealth of Massachusetts by conducting interstate commerce, actively advertising to, and contracting to residents of Massachusetts; this Court exercising personal jurisdiction over Defendant does not offend the traditional notion of fair play and substantial justice.

6.  Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in Massachusetts within this Court's judicial district, as well as because the unlawful practices occurred and/or continue to occur within the Commonwealth of Massachusetts. Should it apply, venue is also proper under 42 U.S.C. § 2000e-5(f)(3), *et seq.* because Massachusetts is the State in which the unlawful employment practice is alleged to have been committed.

## ADMINISTRATIVE PROCEDURES

7.  On or about August 29, 2021, Charges of Discrimination were timely filed with the Massachusetts Commission Against Discrimination (MCAD) and co-filed with the Equal Employment Opportunity Commission (EEOC).

8.  On or about May 9, 2022 the MCAD issued its withdrawal of jurisdiction and thereafter on May 13, 2022, the EEOC issued its Notice of Right to Sue (MCAD 21BEM01822 and EEOC NO. 16C-2021-01608) enabling this private civil action to be filed.

9.  This Complaint was timely filed after issuance of the MCAD and EEOC Notices.

## FACTUAL ALLEGATIONS

10. Plaintiff is a man well over 40 years old; at the time he brought this claim he was 63 years old.

11. Thus, Plaintiff is afforded protections of the Age Discrimination Employment Act ("ADEA") and the state analog 151B.

12. Plaintiff also suffers from the disabling medical conditions of Bell's Palsy and TMJ; Plaintiff's disabling conditions are visible in that his right eye is, at baseline, is partially closed and he has a crooked smile.

13. Plaintiff's conditions substantially impact one or more major life functions, including eating and talking, especially when stress exacerbates these conditions.

14. Plaintiff is a qualified person with a disability as he has physical impairments which substantially limit one more major life function; at all times relevant however, he was able to perform all essential functions of his job with or without accommodation.

15. Thus, Plaintiff was afforded protections of the Americans With Disabilities Act ("ADA") and state analog 151B.

16. Plaintiff is also protected by the Fair Labor Standards Act, the Massachusetts Wage Act, and has further protections against retaliation for reporting COVID-related quarantine pay issues under The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., as amended by the Families First Coronavirus Response Act, Public Law 116-127 (FFCRA).

17. Defendant employs security officers at different locations contracted to receive security services.

18. From March 13, 2020 through August 19, 2021, Plaintiff worked for Defendant in Andover, Massachusetts as a Critical Alarm Monitoring Center (CAMC) Operator and Security Officer at the Pfizer client site.

19. While working as a CAMC Operator, Plaintiff was the only employee over the age of 40 that he was aware of; in fact, out of a total of nine (9) employees, inclusive of supervisors, upon information and belief they were all in their 30's or younger.

20. At all times relevant, Plaintiff's performance met or exceeded Defendant's legitimate expectations according to Plaintiff's employment records, supervisors, manager(s), and Pfizer employees.

21. By way of background, on February 25, 2020, Plaintiff applied to work for Defendant.

22. At the time Plaintiff applied, he had many years of relevant work experience and expertise.

23. On March 5, 2020, Plaintiff received a conditional offer of employment for a Pfizer Command Center CAMC position with working hours stated to be Monday through Friday from 11:00 AM to 7:00 PM and a pay rate of $20 per hour.

24. Plaintiff accepted this offer on March 12, 2020, by signing the offer letter and relied upon the fact that his hours would be as stated on the offer letter but with the option to work overtime.

25. Upon information and belief, Defendant has a work culture, as well as patterns and practices, that would be described as "ageist" or discriminatory towards older workers.

26. In the CAMC Unit, Plaintiff worked directly with a team of employees, including but not exclusive to: Manager James Casaburri ("Mr. Casaburri"), his first Supervisor Johnathan Washburn ("Mr. Washburn"), his later supervisor Garrett LeMons ("Mr. LeMons"), Officer Jacob Moulton ("Mr. Moulton"), Officer Jane Wierzbicki ("Ms. Wierzbicki"), and Officer Charles Olson ("Mr. Olson").

27. Around the time of Plaintiff's hire, in or around March of 2020, Manager Casaburri placed Mr. Washburn (age 29) as the supervisor of the group.

28. From the time of his hiring through his constructive discharge much later, Plaintiff exhibited exemplary work practices and attendance with what Plaintiff understood from supervisors to be the fewest errors made by any member of the CAMC team.

29. Plaintiff was also, upon information and belief, the only member who took part in the CAMC audit of processes.

30. From the time of his hiring through his constructive discharge, Plaintiff felt excluded due to his age, heard age-related comments, and remained the oldest by far on his team.

31. Moreover, the new hires continued to be very young, such as Mr. LeMons (age 25), who was hired on April 23, 2020, well after Plaintiff.

32. First Supervisor, Mr. Washburn, socialized with Mr. LeMons and the other younger employees to the exclusion of Plaintiff.

33. Mr. Washburn and Mr. Casaburri then, not long after hiring him, chose Mr. LeMons as the secondary supervisor.

34. Yet, it was Plaintiff who both Mr. Casaburri and Mr. Washburn used to train Plaintiff's coworkers such as Mr. Olson and Mr. Moulton, and Plaintiff even trained his own supervisor Mr. LeMons (in CAMC processes) as well as other new hires as time went on.

35. Mr. Washburn and Mr. Casaburri passed over Plaintiff for this promotion because of his age and/or disability.

36. Mr. Casaburri never inquired about Plaintiff's far-superior qualifications for the supervisor position before assigning Mr. LeMons that job.

37. Mr. Casaburri never asked whether Plaintiff was interested in the supervisor position before assigning Mr. LeMons that job.

38. Upon information and belief, in addition to having more clout, the supervisor position pays more per hour.

39. During his employment with Defendant, Plaintiff, as the oldest employee on the CAMC team, increasingly felt excluded and ostracized from the other employees because of his age.

40. For example, the employees and supervisors / manager often enjoyed meals together and went to shooting ranges together, while Plaintiff was systematically excluded.

41. Then, on or about December 21, 2021, during his work shift, Plaintiff began experiencing symptoms of COVID-19.

42. During this shift, Plaintiff received a call from Chris Dorr ("Mr. Dorr"), an employee of Pfizer.

43. Mr. Dorr told Plaintiff to go home and reassured Plaintiff "don't worry about work you're going to get paid."

44. Plaintiff was out of work due to contracting COVID-19.

45. Without approval from Plaintiff, Defendant used Plaintiff's vacation time and sick time to pay him for a portion of his extended absence.

46. As a result, Plaintiff was deprived of approximately twenty to thirty hours of pay.

47. On or around January 5, 2021, Plaintiff returned to work and inquired what had happened to his pay.

48. Plaintiff specifically contacted Mr. Casaburri and Defendant's Human Resources Manager Debra York ("Ms. York") and asked why his vacation time was used up while he recovered from COVID-19.

49. Ms. York responded that if Plaintiff had no sick or vacation time available, he would have been paid while he was out of work, but since he had vacation time, that was used.

50. Plaintiff complained to Ms. York that not paying him was unfair; he reported the same thing to Mr. Casaburri.

51. Specifically, Plaintiff's complaint was that the only way that sick time and vacation time usage can be granted to an employee is through a request form submitted by an employee, then to be approved by the manager.

52. Plaintiff also complained that this process was not followed by Defendant and that his vacation and sick time were used without requesting or authorization from Plaintiff.

53. Plaintiff requested that his vacation time and sick time restored.

54. Plaintiff was told by HR's Ms. York that if he wanted his vacation time reinstated, he would have to write a check for $800.00 made payable to Defendant.

55. Plaintiff declined this offer and instead made a wage and hour complaint to the state authority.

56. Ms. York did not discuss this issue with Plaintiff subsequent to his complaint with the state authority.

57. Plaintiff also told Mr. Casaburri he would be filing a complaint with the Labor Board as a remedy.

58. As an exchange for Plaintiff to receive any payment, Mr. Casaburri instructed Plaintiff that he would have to "drop his complaint" with the Labor Board.

59. Plaintiff felt pressured to drop his complaint.

60. From that point forward, in addition to being treated differently because of his age and disability, he was targeted due to his complaints about wages.

61. In February 2021, Mr. Washburn resigned from employment with Defendant.

62. On February 5, 2021, Mr. Casaburri promoted Mr. LeMons to be Plaintiff's new Supervisor. Mr. LeMons at that time was in his mid 20s.

63. This promotion gave Mr. LeMons a $4.00 per hour raise.

64. The job opening was never posted to be applied for by existing or outside candidates and, upon information and belief, no other candidates were considered.

65. Again, Mr. Casaburri did not inquire about Plaintiff's qualifications and experience or determine whether Plaintiff was interested in the position before passing Plaintiff over for this role.

66. Mr. Casaburri chose Mr. LeMons for the job because of Plaintiff's age and/or disability and/or complaints regarding wages.

67. March 13, 2021 was Plaintiff's one year work anniversary.

68. On March 24, 2021, Plaintiff e-mailed Mr. Casaburri inquiring about his work anniversary, receiving a raise, and conducting a performance review; Plaintiff was led to believe by Defendant he should expect yearly performance reviews and performance-based raises.

69. On March 26, 2021, Mr. Casaburri responded to Plaintiff's e-mail that there would be no performance review and that "contract rates [were] staying the same."

70. Plaintiff responded the same day by listing his accomplishments on the job including perfect attendance, the fewest errors made on the team, having trained Mr. Moulton and Mr. LeMons, and working multiple shifts when needed to provide coverage to other team members.

71. Plaintiff pleaded further that based on his hard work he deserved a raise in pay and that if he did not receive a raise, he would have to consider seeking new employment.

72. On March 26, 2021, Mr. Casaburri simply responded to Plaintiff, "[i]f you want to explore other employment opportunities, that is up to you."

73. Plaintiff felt he was intentionally being undervalued based on that comment; he also felt overlooked for promotions and raises in favor of his younger, less qualified but non-disabled coworkers, strictly because of his age and/or disability and/or complaints about wages.

74. Supporting this belief, when Plaintiff asked Mr. Casaburri about career advancement at Defendant, Mr. Casaburri responded something to the effect of: "Well, I mean do you realistically think someone like *you* will be here for the long term" or "how long [he] would

realistically be with the company" because Plaintiff's age was "so close to social security retirement age."

75. Plaintiff took that comment as age and/or disability-related, confirming to Plaintiff that he was being passed over for promotions and excluded from socialization with coworkers due to his age.

76.  Plaintiff was deeply offended by this comment as he did intend to work for Defendant for a long time *because of his age* and the difficulty obtaining a new job.

77. Plaintiff was not in the position to retire at social security retirement age and intended to work until at least 67 and likely past that.

78. Upon information and belief, similarly-situated younger, non-disabled employees received raises and performance reviews.

79. Further, similarly-situated younger, non-disabled, but *less* qualified employees received promotions despite having less experience than Plaintiff.

80. In or around mid-May 2021, Mr. Moulton, a coworker that Plaintiff had trained, began to target Plaintiff.

81. One in day in May of 2021, Mr. Moulton wanted Plaintiff to cover one of Mr. Moulton's shifts on May 21, 2021 so he could attend his girlfriend's birthday party; this is the reason Mr. Moulton *specifically* told Plaintiff directly that he needed the shift covered.

82. Plaintiff told Mr. Moulton that he was unable to cover the shift; Plaintiff had covered for Mr. Moulton in the past but in this instance was not able to do so.

83. Mr. Moulton called Supervisor Mr. LeMons at work to complain that Plaintiff could not cover his shift, which Plaintiff heard because Mr. LeMons was on speakerphone and he was in the same workspace as Mr. LeMons.

84. During this call, Plaintiff heard Mr. Moulton describe Plaintiff as "no use" or "useless"; he further stated, "what good is having him here if he can't be flexible and work for people?"

85. Mr. Moulton did not refer to younger, non-disabled coworkers as he did Plaintiff.

86. Moreover, being "useless" is a stereotype associated with both age and disability.

87. Plaintiff took the comment to be age and/or disability related, since his level of "usefulness" was high objectively due to his job performance.

88. Following overhearing the conversation Plaintiff complained to Mr. LeMons, Plaintiff's direct supervisor, that Mr. Moulton was describing him as "useless" and described other offensive harassing behavior to Mr. LeMons.

89. Plaintiff requested his supervisor, Mr. LeMons, intervene and make Mr. Moulton's disrespectful behavior stop.

90. Mr. LeMons responded to Plaintiff: "Oh it's no big deal."

91. Plaintiff protested and insisted that it was a "big deal" to him and that he wanted both Mr. LeMons and Manager Mr. Casaburri to speak to Mr. Moulton about his disparaging, offensive, untrue, and discriminatory comments.

92. Mr. LeMons declined Plaintiff's request and, upon information and belief, did not escalate this issue to human resources as required by company policy; upon information and belief there was no investigation into this complaint.

93. Plaintiff then insisted that Mr. LeMons assist Plaintiff in filing a formal complaint with Human Resources.

94. Upon information and belief, Mr. Lemons did nothing to honor Plaintiff's request.

95. Plaintiff next went to Mr. Casaburri to file a complaint with Human Resources.

96. Upon information and belief, Mr. Casaburri similarly did nothing to honor Plaintiff's request.

97. Plaintiff was never contacted by Human Resources or any manager about this incident where Mr. Moulton called Plaintiff of "no use" despite requesting a report to Human Resources and despite making reports to both his supervisor and manager, Mr. LeMons and Mr. Casaburri.

98. Notably, in Defendant's position paper Defendant explains this (and other) incidents of reported discrimination away; Defendant claims that Plaintiff was untruthful that Mr. Moulton requested the shift covered because of his girlfriend's birthday but instead, Mr. Moulton needed the shift off for an "emergency dentist appointment" on May 21, 2021. See Defs. Position Paper at 7.

99. Defendant proved that it is untruthful in covering how it handled Plaintiff's discrimination however; specifically, the documentation Defendant provided in Exhibit 13 to support its under-oath statement by Defendant that Mr. Moulton had an "emergency dentist appointment" on May 21, *2021* was an email from Aspen dental for a dentist appointment for May 21, *2020, not 2021.*

100.   Moreover, the text in Exhibit 13 provided to support the under-oath statement that Mr. Moulton asked for the shift covered due to a dentist appointment – which again is from 2020 not 2021 – speaks of Mr. Moulton starting his dental insurance and simply needing fillings which will "have to wait" if the insurance does not start.

101.   In short, Defendant's defense of its actions is clearly pretextual and provably untrue by *Defendant's own documentation* provided to the MCAD.

102. Notably, this incident of being called "useless" caused Plaintiff to experience high levels of high stress, resulting in flare-ups of Bell's Palsy and TMJ.

103. When Plaintiff experiences high levels of stress, his face tightens and his eye waters making it hard for him to complete his work; it is also painful for him.

104. Plaintiff did not experience this stress, or the side effects from his normal job duties while employed by Defendant.

105. As a result of these flare-ups, Plaintiff took two sick days to recover both mentally and physically.

106. Plaintiff alerted Mr. Casaburri via text message that he would not be coming into work, and Mr. Casaburri asked Plaintiff what his symptoms were; in fact, Mr. Casaburri insisted that Plaintiff tell him what was wrong with him.

107. Plaintiff stated it was a "private matter" but felt forced to describe the tightness in his face and neck along with high levels of pain he felt as a result, so he did so.

108. Moreover, Plaintiff reported to Mr. Casaburri that he was experiencing these exacerbated symptoms because of the recent event (above) causing high stress levels.

109. Mr. Casaburri simply responded, "Okay then."

110. Plaintiff felt belittled by Mr. Casaburri's dismissive response after being forced to describe, specifically, how his disabilities were manifesting due to the aforesaid workplace stress.

111. Defendant claims in its position paper to the MCAD that this was the "first time" Plaintiff had disclosed his disability to Mr. Casaburri; that is untrue. See Defs. Pos. Paper at 8.

112. Plaintiff had to disclose the condition to Mr. Casaburri due to the flare ups that occur and moreover, Plaintiff's face is slanted and his eye waters; it is obvious he has a medical condition in other words.

113. After this set of events in May of 2021 when Plaintiff reported – to both Mr. Casaburri and Mr. LeMons - being called "useless" and after having a flare up in his disability which he reported to Mr. Casaburri, Plaintiff's work conditions worsened swiftly.

114. Around this time, the harassment by coworkers worsened to overt age and disability discrimination and harassment.

115. For example, on or about June 16, 2021, Mr. LeMons sent Plaintiff a text message asking Plaintiff to work on June 25, 2021 from 7 AM to 7 PM; that shift involved Plaintiff covering Mr. LeMons' shift from 7 AM to 3 PM and then Plaintiff would be paid overtime to work 3 PM to 7 PM.

12

116. Plaintiff accepted this extended shift.

117. On June 25, 2021, around 3 PM, after Plaintiff had been at work for eight (8) hours already, Mr. Olsen, who was 21 years of age, entered.

118. Plaintiff informed Mr. Olsen that he "needed break" and that he had been on since 7 AM.

119. Mr. Olsen gave Plaintiff a hard time about wanting a break; even Defendant admitted in its position paper that Mr. Olsen told Plaintiff he would not take over until 5 PM. See Defs. Pos. Paper at 8.

120. Mr. Olson then told Plaintiff he should not be at work because Plaintiff's name was not on the schedule; Plaintiff responded to Mr. Olson that he was supposed to be at work that day.

121. Mr. Olson, who is 21-years-old, standing at what Plaintiff estimated to be 6' 7" and weighing approximately 350 lbs., got visibly angry and confrontational with Plaintiff.

122. As Plaintiff was trying to return to his chair, Mr. Olson blocked Plaintiff's access to his chair by putting his arms out wide, preventing Plaintiff from sitting down and yelled at Plaintiff, "GO HOME AND SLEEP OLD MAN!"

123. Plaintiff immediately reported this incident to Mr. Casaburri to complain about the harassing comments and to resolve the disagreement over Plaintiff's work schedule.

124. Mr. Casaburri was degrading to Plaintiff as he reported the concerns; first, he forced Plaintiff to show the text from Mr. LeMons to prove he was supposed to be at work for the 7 AM to 7 PM shift.

125. Mr. Casaburri took the word of younger, non-disabled coworkers without requiring them to prove themselves, such as making Plaintiff show the text before believing him that he should be at work.

126. After Plaintiff showed the text message from Mr. LeMons to Mr. Casaburri, Mr. Casaburri only responded, "Oh yeah you are supposed to be here."

127. Plaintiff asked for an apology from Mr. Casaburri and he refused.

128. Second, Mr. Casaburri wholly dismissed Plaintiff's report regarding Mr. Olson calling Plaintiff "Old Man" and saying he should "go home and sleep" which Plaintiff took as a disability and age-related comment.

129. Mr. Olson did not call any other, younger, non-disabled employees "Old M[e]n" or instruct them to "go home and sleep."

130. Plaintiff again asked for an apology and asked again that Mr. Casaburri address Mr. Olson for making the "old man" comment; Mr. Casaburri refused and did nothing.

131. Upon information and belief, this incident was also not escalated to Human Resources, there was no investigation, and no swift remedial action to stop such harassment.

132. Plaintiff was extremely distraught over this latest incident and the lack of any repercussions against those who had harassed him because of his age and disability.

133. Plaintiff asked Mr. Casaburri to go home early from his shift due to being distraught; Mr. Casaburri curtly replied, "I don't care, you can go home."

134. By having to leave early from this shift deprived Plaintiff of three hours of overtime.

135. In addition to age-based harassment and age-related comments by Mr. Moulton ("useless"), Mr. Casaburri (reference to retirement age), and Mr. Olson ("old man" and "go sleep") described above, comments about Plaintiff's age were common in the workplace during the entire duration, but especially towards the end of Plaintiff's employment with Defendant.

136. In fact, other coworkers used the term "Old Man" on multiple occasions, and even the supervisor and manager, Mr. LeMons and Mr. Casaburri, made these kinds of comments.

137. Moreover, Plaintiff would, on occasion, play music from the 1960's and 70's.

138. On one occasion, Mr. LeMons said "OMG my old man plays that music" and told Plaintiff to shut the "oldies music" off because Mr. LeMons "didn't want to hear it."

139. After this, Plaintiff did not play his music to avoid taunting by coworkers because if his age.

140. On other occasions, Plaintiff's younger coworkers would publicly quiz Plaintiff on popular bands, asking if he knew them, and then joke to each other about how Plaintiff was so "out of touch" with modern music.

141. These incidents occurred in front of supervisors Mr. Washburn and Mr. LeMons many times but these supervisors did nothing and also participated in it.

142. These supervisors also did not escalate or report these events to Human Resources despite the policy requirement to do so.

143. Finally, Plaintiff was made to feel that he had to work with perfection while his younger coworkers were being treated much more favorably and with more flexibility.

144. For example, when Plaintiff's coworkers were found to have been sleeping in patrol cars on the job, they were either not disciplined *at all* or not disciplined in accordance with company policy for such an infraction, which is immediate termination.

145. Furthermore, other younger employees were not often disciplined for tardiness or work absences in accordance with Securitas Policy.

146. However, Plaintiff would be chastised for not being able to work for younger coworkers to cover their shifts when they wanted a non-emergency day off.

147. On June 28, 2021, because of continued differential treatment and age-based harassment, which had been reported to Human Resources' Ms. York, Mr. Casaburri, and Mr. LeMons on several occasions with no swift remedial action, Plaintiff emailed Mr. Casaburri and Ms. York.

148. In this email, Plaintiff requested an immediate transfer from the CAMC unit; specifically, Plaintiff stated he was, "physically and mentally sick from recent events that have transpired within the CAMC organization."

149. Mr. Casaburri and Ms. York responded to Plaintiff regarding his request for a transfer but failed to ask *anything* about the events at work; notably Mr. Casaburri knew exactly what Plaintiff was referring to.

150. Upon information and belief, no Human Resources investigation was conducted and there was no remedial action taken to remedy the ongoing and reported disability and age-based discrimination and harassment by both coworkers and superiors.

151. Moreover, following Plaintiff's transfer request and reporting of ongoing harassment and discrimination, Mr. Casaburri retaliated against Plaintiff.

152. For example, Defendant's solution to Plaintiff's coworker harassment was to transfer him to a less-desirable guard shack position that only paid $16.50 per hour as opposed to the $20.00 per hour Plaintiff received working as a CAMC operator.

153. Since Defendant took no action to stop the age and disability-based harassment and discrimination, Plaintiff was forced to accept this demotion and pay cut.

154. Defendant should have taken swift remedial action and put an end to the treatment of Plaintiff which resulted in him having to transfer out, or Defendant should have transferred Plaintiff but maintained his pay; at minimum, Defendant should have investigated but instead did nothing.

155. Upon information and belief, Plaintiff was placed in this assignment and given a pay cut as retaliation for reporting his age-and-disability related harassment and disparate treatment.

156. Plaintiff's transfer was completed as of June 28, 2021.

157. On July 2, 2021, due to the lack of swift remedial action by Defendant, Plaintiff verbally made an external report to the Massachusetts Commission Against Discrimination and started the process to file a complaint for harassment, discrimination, and retaliation[1].

---

[1] Plaintiff later engaged counsel who, in late August 2021, after Plaintiff had constructively discharged, drafted and filed the charges on behalf of Plaintiff. The charges alleged age and disability harassment and discrimination as well as retaliation.

158. Also on July 2, 2021, Plaintiff emailed Ms. York of HR complaining about all of the above incidents of age-based harassment and discrimination as well as reported the denials of advancement opportunities and raises.

159. Ms. York did not respond to Plaintiff's e-mail.

160. At the time of Plaintiff's transfer, Plaintiff was told he would receive a new supervisor but instead, Mr. Casaburri remained Plaintiff's manager.

161. On July 12, 2021, Mr. Casaburri removed Plaintiff from the less-desirable guard shack position and placed Plaintiff in an even more undesirable assignment doing fire watch in Building G.

162. This area is very remote and has very poor cell phone service.

163. This post required significantly more physical activity than other assignments at CAMC.

164. Upon information and belief, Plaintiff was placed in this assignment as retaliation for reporting his age-and-disability-related harassment and disparate treatment.

165. Plaintiff twice asked Mr. Casaburri for a laptop to assist him with this new assignment and was denied this request; upon information and belief, the much younger Mr. Moulton, Mr. Olson, and Mr. LeMons were provided laptops when they worked positions outside of the CAMC office.

166. Upon information and belief, Plaintiff was denied his request for a laptop as retaliation for reporting his age-and-disability-related poor treatment at work.

167. During one shift at Building G, Plaintiff had a private phone conversation discussing his complaint with the MCAD for discrimination and was discussing how he was being retaliated against with his job assignments and pay cut at that time.

168. Upon completing this call, Plaintiff discovered Mr. Casaburri lurking behind a door, listening to Plaintiff's discussion; Mr. Casaburri again heard all of Plaintiff's complaints of harassment, discrimination, and by then, retaliation as well, that he had complained about.

169. Mr. Casaburri, again the manager, did not escalate these complaints to Human Resources, and no investigation nor swift remedial action was taken, despite policy requiring action.

170. After hearing the phone discussion about complaints that were in process of being filed with the MCAD, Mr. Casaburri rudely removed Plaintiff from fire watch and escorted Plaintiff back to the guard shack where he was required to stay for the remainder of his shift.

171. Upon information and belief, Plaintiff was humiliatingly removed from fire watch at Building G in retaliation for Plaintiff pursing his complaints about harassment, discrimination, and retaliation after Mr. Casaburri overheard Plaintiff discussing them.

172. As another form of retaliation, due to the cut in his pay from accepting the transfer, Plaintiff repeatedly asked Mr. Casaburri for access to overtime shifts to make up for the gap in his wages but Plaintiff was repeatedly denied overtime shifts.

173. Upon information and belief, Mr. Casaburri denied Plaintiff overtime because of Plaintiff's complaint of age-related poor treatment at work.

174. In fact, around this time when Plaintiff began making only $16.50 per hour, his overtime also all but disappeared from his income and thus pay stubs.

175. Plaintiff's income was cut so significantly between the pay cut and his denial of overtime, coupled with Mr. Casaburri – Plaintiff's manager who took part in the discrimination and retaliation – still being Plaintiff's manager and his ongoing retaliation, Plaintiff was constructively discharged as of August 19, 2021.

176. In his forced resignation letter, Plaintiff again wrote to Ms. York and to Mr. Casaburri about his ongoing complaints that went unresolved.

177. Plaintiff described the numerous complaints he had made to Ms. York and Mr. Casaburri about how his "much younger" coworkers "disrespect [him] because of [his] age."

178. As to HR, Plaintiff wrote, "[w]hat good is HR if you literally complain about being harassed because of my senior citizen status and my medical conditions yet they do not even respond."

179. Plaintiff wrote, "[i]n closing, I leave depressed, sad, physically sick with aggravated pain in my face (Bells Palsy and TMJ) from the stress brought on by this job which worsens these medical conditions or disabilities as some people call them."

180. Plaintiff also wrote about how he supports two children alone and how he went from a job paying $40,000.00 to a job paying $34,000.00 due to the discrimination and retaliation.

181. Plaintiff ended his letter with, "[a]ll employees should be treated equally regardless of age and medical conditions."

182. Since the date of Plaintiff's hire by Defendant, Plaintiff had to endure a long string of unlawful and embarrassing harassment, discrimination, and mistreatment because of his age and disability.

183. Since the date of Plaintiff's hire by Defendant, Plaintiff was also denied promotions, advancement opportunities, and raises, with all these benefits going instead to his much younger, non-disabled but less experienced coworkers.

184. Throughout his employment, Plaintiff experienced exacerbation of disability-related symptoms because of this unlawful harassment and discrimination at work which caused both physical pain and emotional distress resulting in physical injury.

185. Despite numerous reports to his supervisor, manager, and Human Resources about numerous incidents involving numerous individuals over a long period of time which qualify as harassment, discrimination, and retaliation, Defendant never swiftly remediated or even investigated Plaintiff's complaints.

186. Defendant's policies require investigation and swift remedial action of all reports to supervisors, managers, and Human Resources.

187. Specifically, Defendant's policies states:

The Company has a policy against all forms of unlawful discrimination or harassment. All reasonable steps necessary are taken to prevent discrimination and harassment from occurring in the workplace. The principles outlined in this brochure also apply to harassing behavior based upon race/ethnicity, color, national origin, ancestry, sex/gender, gender identity/expression, sexual orientation, marital/parental status, pregnancy/childbirth or related conditions, religion, creed, citizenship status, age, disability, genetic information, veteran status or any other status protected by local, state or federal law. **If you are aware of any discrimination or harassing comments or conduct regarding any of these categories, please bring such information to the attention of Securitas USA management.**

188. The policies also make it clear to: "[d]o not permit employees to tease each other - Prohibit name-calling, slang and slurs."

189. The policies also state:

**All Managers and Supervisors:**

**If you see or are told about instances of sexual harassment, you are required to follow the chain of command and immediately forward the report to the Company through your Branch Human Resources, Branch Management, or Region Human Resources. You do not have a choice. It is your responsibility as Company leaders to prevent discrimination and harassment in the workplace.**

190. The policies state:

Any employee who believes that he or she has been subject to discrimination, harassment, or retaliation should promptly report the situation to a Human Resources representative, their supervisor, branch management or the Securitas Hotline. **The Company will undertake a fair, complete, and timely investigation by qualified and impartial personnel. The investigation will be documented and tracked to ensure reasonable progress and timely closure[]…**

191. Additionally, the policies state: "Supervisors are required to immediately forward reports of harassment to Human Resources or Company branch management."

192. Moreover, the policies state: "The Company prohibits retaliation against any employee for making a complaint of discrimination, harassment, or retaliation in good faith."

193. The policies also state: "Any individual who commits such a violation [of harassment or discrimination] will be subject to discipline and possible termination of employment."

194. Finally, the policies state: "[c]orrective, remedial action, up to an including termination of employment, will be taken if misconduct is found."

195. Defendant failed to follow *all of the above policies*.

196. Moreover, Defendant further retaliated by making false allegations about Plaintiff in its MCAD position paper, alleging a number of incidents that would have required discipline of Plaintiff; but Plaintiff was never disciplined.

197. Finally, Defendant lied under oath to the MCAD in its position paper while attempting to explain away one of the events regarding Mr. Moulton's shift; yet, Defendant's own documents refute their claims.

198. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff suffered and continues to suffer loss of income and earning capacity; loss of work-related benefits, privileges, promotions, and status; experienced humiliation and loss of standing in the community; suffered and continue to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries, all continuing to date.

## COUNT ONE
### *AGE – DISCRIMINATORY TERMS AND CONDITIONS*
### *AGE – DISCRIMINATORY TERMINATION*
### **Violation of The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)**
### **("ADEA") and Violation of Mass. Gen. L. ch. 151B et. seq. (151B)**

199. Paragraphs 1-198 are hereby incorporated by reference in their entirety.

200. Plaintiff is afforded protections from discrimination and harassment on the basis of his age under ADEA and 151B.

201. Defendant's agents, including his direct supervisors and manager, subjected Plaintiff to a severe and pervasive, unresolved hostile work environment and disparate treatment because of his age, which changed the terms and conditions of his employment.

202. Defendant's agents in leadership and Human Resources knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, ADEA and 151B.

21

203. Defendant's agents constructively terminated Plaintiff because of his age in violation of, *inter alia*, ADEA and 151B.

204. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, ADEA and 151B.

205. Defendant and its agents have a pattern and practice of treating older employees disparately from younger employees.

206. But for Defendant's agents' intentional discrimination, Plaintiff would not have been constructively terminated.

207. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

208. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

209. Plaintiff seeks multiple damages, if applicable, under the ADEA.

**COUNT TWO**
*RETALIATION – DISCRIMINATORY TERMS AND CONDITIONS*
*RETALIATION - DISCRIMINATORY TERMINATION*
***Violation of The Age Discrimination in Employment Act of 1967, 29 U.S.C.  § 623(d)***
***("ADEA") and Violation of Mass. Gen. L. ch. 151B et. seq. (151B)***

210. Paragraphs 1-198 are hereby incorporated by reference in their entirety.

211. Plaintiff is over 40 years of age and therefore is protected from retaliation from reporting age-based discrimination and related protected acts.

212. Plaintiff took part in several protected acts including complaining about age-based discrimination and harassment to (and by) his supervisor and his manager; he also reported it to HR.

213. Defendant's agents, including his direct supervisors and manager, subjected Plaintiff to a severe and pervasive, unresolved hostile work environment and disparate treatment in retaliation for the protected activity, which changed the terms and conditions of his employment.

214. Defendant's agents in leadership and Human Resources knew of the harassing and retaliatory conduct but failed to take swift, remedial action in violation of, *inter alia*, ADEA and 151B.

215. Defendant's agents constructively terminated Plaintiff because of retaliation for his protected activity in violation of, *inter alia*, ADEA and 151B.

216. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated.

217. Defendant's agents' retaliatory conduct, policies, and practices were intentional, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

218. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

219. Because Defendant's retaliatory conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

220. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

221. Plaintiff seeks multiple damages, if applicable, under the ADEA.

## COUNT THREE
### DISABILITY – *DISCRIMINATORY TERMS AND CONDITIONS*
### *DISABILITY - DISCRIMINATORY TERMINATION*
### *Violation of Americans with Disabilities Act 42 U.S.C. § 12112 (ADA) and Violation of Mass. Gen. L. ch. 151B et. seq. (151B)*

222. Paragraphs 1-198 are hereby incorporated by reference in their entirety.

223. Plaintiff is a qualified person with a disability.

224. Plaintiff's Bell's Palsy and TMJ qualify as disabilities under ADA and 151B.

225. These medical conditions substantially impair one or more major life functions, including but not exclusive to eating and talking, especially when exacerbated by stress.

226. Regardless, at all times relevant, Plaintiff was able to perform the necessary job functions with or without accommodation.

227. Therefore, Plaintiff was protected from harassment, discrimination, and termination because of disability under the ADA and 151B.

228. Defendant's agents, including his direct supervisors and manager, subjected Plaintiff to a severe and pervasive, unresolved hostile work environment and disparate treatment because of his disability, which changed the terms and conditions of his employment.

229. Defendant's agents in leadership and Human Resources knew of the harassing and discriminatory conduct but failed to take swift, remedial action in violation of, *inter alia*, ADA and 151B.

230. Defendant's agents constructively terminated Plaintiff because of his disability in violation of, *inter alia*, ADA and 151B.

231. But for Defendant's agents' discriminatory conduct, Plaintiff would not have been constructively terminated.

232. Defendant's agents' discriminatory conduct, policies, and practices were intentional, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

233. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

234. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

235. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

## COUNT FOUR
*RETALIATION – DISCRIMINATORY TERMS AND CONDITIONS*
*RETALIATION - DISCRIMINATORY TERMINATION*
***Violation of Americans with Disabilities Act 42 U.S.C. § 12203 (ADA) and Violation of Mass. Gen. L. ch. 151B et. seq. (151B)***

236. Paragraphs 1-198 are hereby incorporated by reference in their entirety.

237. Plaintiff is a qualified person with a disability and therefore is protected from retaliation from reporting disability-based discrimination and related protected acts.

238. Plaintiff took part in several protected acts including complaining about discrimination and harassment to (and by) his supervisor and his manager; he also reported it to HR.

239. Defendant's agents, including his direct supervisors and manager, subjected Plaintiff to a severe and pervasive, unresolved hostile work environment and disparate treatment in retaliation for the protected activity, which changed the terms and conditions of his employment.

240. Defendant's agents in leadership and Human Resources knew of the harassing and retaliatory conduct but failed to take swift, remedial action in violation of, *inter alia*, ADA and 151B.

241. Defendant's agents constructively terminated Plaintiff because of retaliation for his protected activity in violation of, *inter alia*, ADA and 151B.

242. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated.

243. Defendant's agents' retaliatory conduct, policies, and practices were intentional, motivated by animus, impermissible and unlawful considerations, which violate, *inter alia*, ADA and 151B.

244. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

245. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

246. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

**COUNT FIVE**
*UNPAID COVID 19 QUARANTINE LEAVE*
*RETALIATORY CONSTRUCTIVE DISCHARGE*
**Violation of the FMLA, 29 U.S.C. § 2601, et seq., as amended by the Families First Coronavirus Response Act, Public Law 116-127 (FFCRA)**

247. Paragraphs 1-198are hereby incorporated by reference in their entirety.

248. Plaintiff was entitled to pay during his quarantine for COVID 19 exposure, based on the FMLA, 29 U.S.C. § 2601, *et seq.*, as amended by the Families First Coronavirus Response Act, Public Law 116-127 (FFCRA).

249. Plaintiff was also afforded protections from retaliatory termination for invoking his rights under the FMLA, 29 U.S.C. § 2601, *et seq.*, as amended by the Families First Coronavirus Response Act, Public Law 116-127 (FFCRA).

250. Plaintiff was exposed to COVID 19 during the 2020 worldwide pandemic.

251. As a result of this exposure, Plaintiff notified Defendant that he was exposed.

252. Based on state and the CDC guidelines, Plaintiff had to quarantine for two weeks.

253. Plaintiff was not paid fully for his time in quarantine.

254. Plaintiff engaged in a protected act by complaining about Defendant using his sick and vacation time rather than paying him under the FFCRA for quarantine time.

255. As a direct and proximate result of that protected conduct, Plaintiff was retaliated against, in the manner described above, for that protected act.

256. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, FMLA.

257. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

258. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

## COUNT SIX
*RETALIATION*
***Violation of The Fair Labor Standards Act (FLSA) 29 U.S.C. § 215(a)(3) and Massachusetts Weekly Payment of Wages Act ("Wage Act"), M. G. L. c. 149 sec. 148, et seq.***

259. Paragraphs 1-198are hereby incorporated by reference in their entirety.

260. The Wage Act and the FLSA protect employees who complain about missing pay, including missing vacation or sick time.

261. Plaintiff was therefore protected from retaliatory harassment, discrimination, and termination for exercising his rights to complain about a missing vacation or sick time.

262. Plaintiff engaged in a protected act by complaining about Defendant using his sick and vacation time rather than paying him under the FFCRA for quarantine time.

263. As a direct and proximate result of that protected conduct, Plaintiff was retaliated against, in the manner described above, for that protected act.

264. But for Defendant's agents' discriminatory and retaliatory conduct, Plaintiff would not have been constructively terminated.

265. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, the FLSA and Wage Act.

266. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

267. Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

268. Plaintiff seeks multiple damages, if applicable, under the FLSA and Wage Act.

## <u>PRAYER FOR RELEIF</u>

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b. Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c. Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate him for her mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d. Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e. Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for their malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f.  Order, for all applicable Counts, that Defendant pay pre-judgement and post-judgement interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

g.  Retain jurisdiction of this action to ensure full compliance; and

h.  Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

***PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.***

July 22, 2022

Respectfully Submitted by,
PLAINTIFF ANTHONY DELLO RUSSO,
By his attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq.
BBO: 690605
Munro-Delotto Law, LLC
400 Westminster Street, Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com